UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNN T. PASLEY,

                                    CASE NO. 2:08 -cv-13185

               Plaintiff,         JUDGE AVERN COHN
                                    MAGISTRATE JUDGE PAUL J. KOMIVES

v.



VERA CONERLY,


               Defendant,

_____/


**REPORT AND RECOMMENDATION REGARDING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. Ent. 15) and**
**PLAINTIFF'S MOTION FOR DISCOVERY (Doc. Ent. 25)**


*Table of Contents*

I.      RECOMMENDATION ................................................................................................ 2

II.    REPORT ................................................................................................................... 2
      A.     On September 29, 2009, the Sixth Circuit Remanded This Case. .................................... 2
      B.     Currently before the Court is Defendant's January 5, 2010 Motion for Summary Judgment. ........ 5
      C.     Fed. R. Civ. P. 56 ........................................................................................................ 8
      D.     Plaintiff's Factual Allegations Largely Relate to Three Events. .................................. 10
           1.     The November 21, 2007 administrative hearing regarding legal property .................... 10
           2.     The November 29, 2007 phone disbursement request ................................................ 12
           3.     The December 10, 2007 mail request & PPD activation ............................................... 14
           4.     The December 13, 2007 grievance regarding these events .......................................... 16
      E.     The Court Should Deny Defendant's Motion for Summary Judgment. ....................... 17
           1.     Defendant is not entitled to summary judgment on plaintiff's First Amendment retaliation
                claim. ......................................................................................................... 17
                a.     Plaintiff's November 2007 threat to file a grievance constitutes protected
                     conduct. ............................................................................................ 17
                b.     Plaintiff has described adverse actions which followed the alleged protected
                     conduct. ............................................................................................ 19
                c.     There is enough indirect evidence to infer a retaliatory motive by defendant.
                     ........................................................................................................ 44
           2.     Defendant is not entitled to qualified immunity on plaintiff's First Amendment retaliation
                claim. ......................................................................................................... 46

III.    NOTICE TO PARTIES REGARDING OBJECTIONS ............................................. 49

1

**I.     RECOMMENDATION:**  The Court should deny defendant Conerly's January 5, 2010 motion for summary judgment.  Doc. Ent. 15.  Specifically, the Court should conclude that defendant is not entitled to summary judgment or qualified immunity with respect to plaintiff's First Amendment retaliation claim.

Furthermore, the Court should construe plaintiff's March 8, 2010 motion for discovery (Doc. Ent. 25) as a sur-reply and defendant's September 1, 2010 filing (Doc. Ent. 26) as a response to the sur-reply.

**II.     REPORT:**

**A.     On September 29, 2009, the Sixth Circuit Remanded This Case.[1]**

Plaintiff is currently incarcerated at the G. Robert Cotton Correctional Facility (JCF) in Jackson, Michigan, where he is serving a sentence for a violation of Mich. Comp. Laws § 750.529

---

[1]Plaintiff has filed other prisoner civil rights cases.  During June 2007, before the instant case was filed, plaintiff filed a prisoner civil rights case (***Pasley v. Oliver*, Case No. 2:07-cv-12482-LPZ-PJK (E.D. Mich), Case No. 01:07-cv-00583-JTN-TPG (W.D. Mich.)**), regarding which judgment was entered on December 14, 2009 and an order to proceed in forma pauperis regarding appeal fee was entered on January 5, 2010.  Attached to the instant complaint are disbursement authorizations regarding this case. Doc. Ent. 1 at 17 (March 24, 2008), 18 (March 24, 2008).

On September 16, 2008, after the instant case was filed, plaintiff filed another prisoner civil rights case (***Pasley v. Does*, Case No. 1:08-cv-13988-TLL-VMM (E.D. Mich.)**), regarding which judgment was entered on December 2, 2008.  On September 23, 2009, the Sixth Circuit dismissed the case for want of prosecution.  *Pasley v. Does*, No. 09-1074.  On January 25, 2010, the United States Supreme Court denied the petition for writ of certiorari.  *Pasley v. Does*, No. 09-7737, 130 S.Ct. 1293 (2010).

Most recently, plaintiff filed **Case No. 2:10-cv-11805-AJT-MKM**, against Caruso, a doctor and several physicians assistants regarding events which span the period of September 20, 2008 - August 27, 2009.  Doc. Ent. 1 ¶¶ 12-38.  Plaintiff has been given leave to file an amended complaint on or before September 10, 2010.  Doc. Ent. 15 at 2.

("Use or possession of dangerous weapon; aggravated assault; penalty.").[2]

On July 24, 2008, while incarcerated at the Macomb Correctional Facility (MRF), plaintiff filed the instant case. Doc. Ent. 1, Doc. Ent. 15-5 at 2 (Transit List).[3] Plaintiff's complaint names as a defendant Vera Conerly, an employee of the Michigan Department of Corrections (MDOC), who is described as an Assistant Resident Unit Supervisor (ARUS) at the Huron Valley Complex-Men's Facility (HVM)[4] in Ypsilanti, Michigan.[5] Plaintiff's complaint is based upon the First, Eighth and Fourteenth Amendments and defendant's "constant haras[s]ment, intimidation and retaliation against plaintiff[,]" and defendant's "fail[ure] to process plaintiff's paperwork and mail." Doc. Ent. 1 ¶¶ 2, 3 & 59. *See also* Doc. Ent. 1 ¶¶ 60A, 60C.

Plaintiff seeks nominal damages of $50,000 and punitive damages of $100,000 against

_____

[2]Plaintiff appealed his state court conviction. He filed an appeal of the January 30, 1998 order in Case No. 97-001622 (Recorder's Court). On July 11, 2000, the Court of Appeals of Michigan affirmed Pasley's conviction and sentence. *See People v. Pasley*, No. 210712, 2000 WL 33416872, *5 (Mich. App. 2000). On February 26, 2001, the Supreme Court of Michigan denied the application for leave to appeal. *People v. Pasley*, No. 117587, 463 Mich. 973, 623 N.W.2d 600 (Mich. 2001).
   Plaintiff filed an appeal of the April 18, 2002 order in Case No. 97-001622-02 (Wayne County Circuit Court). On September 4, 2003, the Michigan Court of Appeals denied the delayed application for leave. *People v. Pasley*, No. 247593. On January 27, 2004, the Supreme Court of Michigan denied the application for leave to appeal. *People v. Pasley*, No. 124725, 469 Mich. 1003, 675 N.W.2d 594 (Mich. 2004).
   Then, on April 1, 2004, plaintiff filed a petition for writ of habeas corpus (**Pasley v. Romanowski, No. 2:04-cv-71020-JCO-RSW**), regarding which judgment was entered on September 20, 2005. Judgment was affirmed by the Sixth Circuit on July 19, 2007. *Pasley v. Romanowski*, No. 05-2549.
[3]Plaintiff also filed an application to proceed without prepayment of fees. Doc. Ent. 2. It was granted on July 28, 2008. Doc. Ent. 3.
[4]Apparently, this facility is now the Women's Huron Valley Correctional Facility (WHV). This transition allegedly took place on June 20, 2008. Doc. Ent. 15 at 13.
[5]Plaintiff sues defendant Conerly in her individual and official capacities. Doc. Ent. 1 at 1 ¶ 3.

defendant Conerly for violation of his First, Eighth and Fourteenth Amendment rights.  Doc. Ent. 1 at 8 ¶¶ A-C.  He also seeks such other relief to which the Court may deem him entitled.  Doc. Ent. 1 at 8 ¶ D.

On August 5, 2008 Judge Cohn entered an order dismissing the case.  Specifically, he provided:

> Plaintiff's complaint fails to state a claim under § 1983.  The facts as alleged indicate that, at most, Defendant harassed Plaintiff and treated him disrespectfully.  It is well-established that verbal abuse, harassment, and unprofessional conduct do not rise to the level of a constitutional violation for which relief may be granted in a civil rights case. *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (citing *Ivey v. Wilson*, 832 F.2d 950, 954-55 (6th Cir. 1987)).  Accordingly, the complaint is DISMISSED as frivolous under 28 U.S.C. §§ 1915(e)(2)(B)(I) and 1915A(b)(1).

Doc. Ent. 4 at 3.

Plaintiff filed an appeal.  Doc. Entries. 5 and 7.[6]  On September 29, 2009, the Sixth Circuit affirmed the district court's judgment insofar as it dismissed Pasley's Eighth Amendment claim, vacated it as it dismissed his First Amendment claim, and remanded the case for service on the defendant. *Pasley v. Conerly*, 345 Fed.Appx. 981, 986 (6th Cir. 2009).[7]  Thus, only plaintiff's First Amendment claims are at issue.[8]

---

[6]Plaintiff also filed a motion to proceed in forma pauperis on appeal.  Doc. Ent. 6.  By a notice dated September 16, 2008, plaintiff was informed of his failure to comply with the appeal filing fee requirement.  Doc. Ent. 8.  On September 19, 2008, Judge Cohn entered an order waiving prepayment of the appellant filing fee and directing payment of the initial partial filing fee and subsequent payments.  Doc. Ent. 9.

[7]The mandate regarding the Sixth Circuit's September 29, 2009 decision was filed on October 22, 2009.  Doc. Ent. 11.

[8]The Sixth Circuit noted the following about plaintiff's Fourteenth Amendment claim:

> Pasley also attempts to raise a claim under the Fourteenth Amendment.  Because Pasley's claim is cognizable under the First Amendment, it need not be considered under the more generalized due process

**B. Currently before the Court is Defendant's January 5, 2010 Motion for Summary Judgment.**

On October 23, 2009, Judge Cohn entered an order directing service of the complaint on the defendant. Doc. Ent. 12. An appearance of counsel was entered on defendant Conerly's behalf, and her answer was due on January 5, 2010. Doc. Entries 13 and 14. Judge Cohn has referred this case to me for pretrial matters. Doc. Ent. 16.

On January 5, 2010, defendant filed a motion for summary judgment by which she seeks dismissal of this lawsuit. Doc. Ent. 15. First, defendant argues that the evidence does not support Plaintiff's claim that "in retaliation for [p]laintiff's threat to file a grievance after ARUS Conerly gave him a U.S. postal bin for temporary storage, she threatened to have him transferred, backdated and wrote 'NSF' on a disbursement request, refused to mail a card and money to a little girl in Detroit who had been shot, and pulled her PPD [Personal Protection Device] pin." In support of this argument, she claims that (A) "[p]laintiff did not engage in prior protected conduct[,]" and (B) "[p]laintiff did not suffer any adverse action at the hands of [d]efendant Conerly." Doc. Ent. 15 at 12-15. Second, defendant argues that she is entitled to qualified immunity because she did not violate any of plaintiff's constitutional rights. Doc. Ent. 15 at 15-17.

On January 19, 2010, I entered an order requiring plaintiff to file any response on or before

---

provision of Fourteenth Amendment. The Supreme Court held in the context of excessive force claims that, where a specific provision of the Constitution applies, a claim must be analyzed under the specific provision rather than under the Fourteenth Amendment. *Graham v. Conn[o]r*, 490 U.S. 386, 394-95 (19[89]). In *Thaddeus-X v. Blatter*, we applied Graham's holding to claims cognizable under the First Amendment. 175 F.3d 378, 387-88 (6th Cir. 1999) (en banc).

*Pasley*, 345 Fed.Appx. at 984 n.1.

February 22, 2010. Doc. Ent. 17. On January 26, 2010, plaintiff filed a motion to enlarge time. Doc. Ent. 18. In addition to claiming he received defendant's dispositive motion on January 11, 2010, plaintiff specifically disputes the representations that (1) he was never written a misconduct ticket (see Doc. Ent. 15-3 [Vera Conerly Affidavit] ¶ 9); (2) he was transferred from HVM when it was converted to a women's prison on June 20, 2008 (see Doc. Ent. 15 at 13; Doc. Ent. 15-5 [Transit List]); and (3) the notation on his November 19, 2007 disbursement request was done by Business Office Staff (Doc. Ent. Doc. Ent. 15-3 ¶ 6). Doc. Ent. 18 ¶¶ 1, 4.[9] On February 11, 2010, he filed his response. Doc. Ent. 19.

On February 26, 2010, defendant filed a motion for enlargement of time in which to file a reply brief. Doc. Ent. 20.[10] She filed her reply the same day. Doc. Ent. 21. On March 3, 2010, defendant filed the affidavit of Jose Philip (Doc. Ent. 23 at 1-4), to which is attached the affidavit of Karen Whalen (Doc. Ent. 23-2 at 1-3).

On March 8, 2010, plaintiff filed a "motion for discovery," wherein he notes that defendant "made several argument[s] in her reply brief that call[] for this motion for discovery[.]" Doc. Ent. 25 at 1 ¶ 2. Plaintiff argues that "[d]iscovery should be granted so that [he] can obtain [the December 10, 2007] misconduct report and disposition from the hearings division[.]" Doc. Ent. 25 at 7. Furthermore, he seeks discovery "so that he may have an opportunity to dispute [the] [Philip

_____

[9]Therein, plaintiff claimed that he had to "write a[n] institutional kite to the business office to receive the relevant documents to challenge defendant's false declarations and arguments," and he also has to "contact the hearings division to obtain the necessary documents to support Plaintiff's argument that Defendant declarations are not true[.]" Doc. Ent. 18 ¶ 5. On March 5, 2010, I entered an order deeming moot plaintiff's motion to enlarge time. Doc. Ent. 24.
[10]On March 2, 2010, I entered an order granting this motion. Doc. Ent. 22.

and Whalen] affidavits[,]" both of which challenge his complaint, and "so that an attempt can be made to obtain affidavits from . . . Payne, Czata, Cummings, Clark, Hassen and . . . Hill[,]" because they "can help prove [his] case, and make a meaningful challenge to the [Philip and Whalen] affidavits and arguments presented by defendant in her reply brief[.]" Doc. Ent. 25 at 8.[11]

Plaintiff's March 8, 2010 filing was not entered on the docket until August 24, 2010. On September 1, 2010, defendant Conerly filed a response. Doc. Ent. 26. Conerly contends that plaintiff "does not need discovery to attempt to obtain these [non-party] affidavits[,]" as "[n]on-parties are not subject to Rule 33 interrogatories." Doc. Ent. 26 at 4. Conerly further contends that the "[s]tatements of the other non-party officers are unnecessary for the court to rule on Defendant's pending motion." Doc. Ent. 26 at 5. Furthermore, Conerly provides a second affidavit (Doc. Ent. 26-2) and records related to the December 10, 2007 major misconduct report (Doc. Ent. 26-3).

## C.     Fed. R. Civ. P. 56

Summary judgment, pursuant to Fed. R. Civ. P. 56, may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©.

---

[11]Plaintiff filed this motion pursuant to Fed. R. Civ. P. 26(b)(1). Disclosures and discovery in the federal courts are governed by Fed. Rules Civ. P. 26-37. By way of example, Interrogatories to Parties must comply with Rule 33, Requests for Production of Documents must comply with Rule 34, and Requests for Admission must comply with Rule 36.
    Furthermore, discovery in this Court is governed by E.D. Mich. Local Rules 26.1 - 37.2, among which is the requirement that "[a]ny discovery motion filed pursuant to Fed. R. Civ. P. 26 through 37, shall include, in the motion itself or in an attached memorandum, a verbatim recitation of each interrogatory, request, answer, response, and objection which is the subject of the motion or a copy of the actual discovery document which is the subject of the motion." E.D. Mich. LR 37.2.

A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties.

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis,* 542 P.2d 867, 872 (Wyo. 1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)). "In evaluating a motion for summary judgment we view all evidence in the light most favorable to Plaintiff . . . and assess the proof to determine whether there is a genuine need for trial." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998) (citations omitted).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party discharges that burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine triable issue. Fed. R. Civ. P. 56(e); *Gregg*, 801 F.2d at 861.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his pleading, Fed. R. Civ. P. 56(e), a verified complaint . . . satisfies the burden of the nonmovant to respond." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999).[12] "[A] verified complaint . .

---

[12] Plaintiff's complaint was not signed. Doc. Ent. 1 at 8, 31. However, plaintiff's February 11, 2010 response to defendant's motion for summary judgment is signed (Doc. Ent. 19 at 2). Plaintiff's response brief is not signed (Doc. Ent. 19 at 21); however, plaintiff's February 4, 2010 affidavit is signed and notarized (Doc. Ent. 19 at 26).

. would have the same force and effect as an affidavit and would give rise to genuine issues of material fact." *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992). However, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). *See also Hamilton v. Roberts*, No. 97-1696, 1998 WL 639158, *5 (6th Cir. Sept. 10, 1998) (personal knowledge required); *Daniel v. Cox*, No. 96-5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)) (cannot consider hearsay evidence).

"Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient." *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992), citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 246-250 (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a). *Anderson*, 477 U.S. at 250. Consequently, a non-movant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

**D.      Plaintiff's Factual Allegations Largely Relate to Three Events.**

The facts underlying plaintiff's complaint are largely related to the following events: (1) a

November 21, 2007 administrative hearing regarding legal property; (2) a November 29, 2007 phone disbursement request; and (3) a December 10, 2007 mail request. Doc. Ent. 1 ¶¶ 4-23, 24-39, 41-54. Thereafter, plaintiff filed a grievance. Doc. Ent. 1 ¶¶ 55-58.

**1.      The November 21, 2007 administrative hearing regarding legal property**

Plaintiff claims that Conerly routinely harassed, intimidated and retaliated against plaintiff "in violation of his rights in [a] corrupt, arbitrary and capricious manner[.]" Doc. Ent. 1 ¶ 4. On or about October 24, 2007, Resident Unit Officer (RUO) D. Czata informed plaintiff there would be a legal property hearing. Doc. Ent. 1 at 10. As summarized by the Sixth Circuit and taken as true for purposes of the appeal:

> At the times relevant to this appeal, Pasley was housed in the Huron Valley Complex. [On November 21, 2007], the prison conducted an administrative hearing and determined that Pasley possessed a large amount of law-related material that he was entitled to keep. When Pasley approached Conerly, his Assistant Resident Unit Supervisor, about obtaining additional footlockers, she responded, "I don't know why you are keeping all that bull-shit, you are not going home anyway...." Pasley sought help from [Officer Czata]. After [Officer Czata] talked to Conerly about the incident, Conerly brought Pasley into her office, called him a "rat," and supplied him with a single U.S. Postal Service container. When Pasley objected to taking the container, she told him, "Get out of my face." Pasley then told Conerly that he would file a grievance against her if she refused to help him obtain the necessary storage containers. According to Pasley, Conerly told him that if he filed a grievance, she would have him transferred out of the unit and he would lose his job. She then stated, "I use[d] to be married to a warden and I will have your ass transferred so far up North [that] your family [won't] recognize you when you get back." At that point, Pasley took the postal container and left.

> A few days later, [Officer Hassen] searched Pasley's cell and found the postal container, which contained steel rods. [Officer Hassen] told Pasley that he would receive a major misconduct ticket for possessing dangerous contraband. Conerly initially denied giving Pasley the container and encouraged the officer to write the misconduct ticket. However, Conerly recalled giving Pasley the container after Pasley reminded her that she had given him the container in the presence of another officer. Pasley alleges that he later learned that Conerly sent [Officer Hassen] to [plaintiff's] cell to search for the postal container. The day after the search incident, Conerly informed Pasley that she would no longer provide him with services such as processing his mail and disbursing funds from his account.

*Pasley*, 345 Fed.Appx. at 983. *See also* Doc. Ent. 1 ¶¶ 5-20, Doc. Ent. 1 at 10 (Administrative Hearing Report - Formal).

According to plaintiff, the U.S. Postal Service container that Conerly gave plaintiff "could not hold but maybe (4) four books and plaintiff had over (4) footlockers of excessive legal [material][;] [therefore][,] it is perfectly clear that Conerly was setting plaintiff up with this dangerous contraband." Doc. Ent. 1 ¶ 21. Plaintiff claims that "[e]ven after being ordered to provide [him] with the necessary bins to store his legal material[,] [he] did not receive the bins until (9) nine months later." Doc. Ent. 1 ¶ 22; Doc. Ent. 1 at 12 (Disbursement Authorization).[13] In other words, plaintiff claims, Conerly "[d]eliberately failed to provide plaintiff with proper storage to store his excessive legal material after being instructed to do so." Doc. Ent. 1 ¶ 60E. Plaintiff claims that, during the time he waited for his bins, "his room flooded and a great deal of his legal material was destroyed." Doc. Ent. 1 ¶ 23.

## 2.    The November 29, 2007 phone disbursement request[14]

By way of background, Paragraph H of MDOC PD 05.03.130, "Prisoner Telephone Use," effective 01/01/2009, provides in part that "A prisoner who wants to purchase prepaid telephone service must submit a completed Disbursement Authorization (CAR-893) to the business office. The minimum amount of telephone service time that may be purchased is $10 with additional amounts purchased in $5 increments. No refunds shall be issued. *Business office staff shall enter the purchase*

---

[13]As defendant acknowledges, Doc. Ent. 15 at 8, this exhibit is difficult to read. Still, it appears that the Disbursement Authorization is dated in 2008 for an amount of $246.60. Doc. Ent. 1 at 12.
[14]Copies of the November 29, 2007 Disbursement Authorization are attached to plaintiff's complaint. Doc. Ent. 1 at 14, 19.

*of prepaid telephone service within two business days after receipt of an approved disbursement authorization form.* An electronic notification of all daily purchases will be automatically sent to the appropriate telephone company at the end of each business day; the appropriate telephone company will make the prepaid service available for use by the prisoner within three business days after it receives notice of the purchase of the prepaid service." *See* Doc. Ent. 19 at 27-30 (emphasis added); Doc. Ent. 1 ¶ 32.

Here, plaintiff claims that Conerly "impeded upon plaintiff's ability to process his disbursements, cat[a]log orders, phone disbursements and mail[.]" Doc. Ent. 1 ¶ 24.[15] According to plaintiff, "[a]fter about a month or so of not being able to process [these] papers[,] plaintiff informed Officer Payne about the problems that he was having processing his paperwork." Doc. Ent. 1 ¶ 25. Plaintiff claims that, on Thursday, November 29, 2007, he gave Officer Payne a phone disbursement request which Payne placed in Conerly's mail box. Doc. Ent. 1 ¶ 27. On Friday, November 30, 2007, plaintiff approached Officer Payne to see if the disbursement had been processed. According to plaintiff, "Officer Payne looked in the box and the disbursement was still there." Doc. Ent. 1 ¶ 28.

On Monday, December 3, 2007, plaintiff noticed that the disbursement was still in the box. Plaintiff asked Officer Clark to take it to Conerly's office for processing. Doc. Ent. 1 ¶ 30. Conerly called plaintiff into her office and allegedly said, "I don't know why you are so determined to have this stuff given to me, I've already told you that I will not be processing anything for you[.]" Conerly then told plaintiff, "get out [of] my office please." Doc. Ent. 1 ¶ 31.

---

[15]At the conclusion of his complaint, plaintiff alleges that Conerly "[d]eliberately failed to process any of plaintiff's important documents." Doc. Ent. 1 ¶ 60C.

Plaintiff claims he "constantly checked for a little over a week to see if his money had been process[ed], and the money was never placed on plaintiff's phone card." Doc. Ent. 1 ¶ 32. Eventually, plaintiff received his disbursement back; however, according to plaintiff, "Conerly had back dated the disbursem[e]nt to reflect that she processed the disbursement on [Friday, November 30, 2007][,]" and Conerly returned it "with a notation indicating that plaintiff had NSF to process the disbursement[.]" Plaintiff claims this was false, because he "had more than enough funds to process the disbursement." Doc. Ent. 1 ¶ 34. It is plaintiff's position that Conerly "[d]eliberately falsified and changed the date on plaintiff's disbursement to further harass and intimidate plaintiff." Doc. Ent. 1 ¶ 60B. Furthermore, plaintiff claims, Officer Clark took the disbursement request into Conerly's office on Monday, December 3, 2007; therefore, it is not possible that Conerly processed it on November 30, 2007. Doc. Ent. 1 ¶ 36.[16]

Plaintiff claims he "was forced . . . to go through other ARUSs to process his paperwork[.]" Doc. Ent. 1 ¶ 37.[17] When Conerly learned plaintiff was doing so, he claims, Conerly "sent out an e-mail to all the ARUSs informing them not to process plaintiff's paperwork, that it was her job to do so and she would do it." Doc. Ent. 1 ¶ 38. Plaintiff was allegedly informed about this e-mail when he approached ARUS Hill and Holliwill to process some documents. Doc. Ent. 1 ¶ 39.

### 3.    The December 10, 2007 mail request & PPD activation

---

[16]Plaintiff has provided copies of trust account statements. *See* Doc. Ent. 1 at 14-15 (Disbursement Authorization dated Nov. 29, 2007 & Trust Account Statement for Nov. 19, 2007 - Dec. 3, 2007), 27-28 (Trust Account Statement for Dec. 5, 2007 - Jan. 14, 2008).
[17]In support of this statement, plaintiff cites to disbursement authorizations showing different signatures to demonstrate that "for months [he] had to go through other staff members to process [his] materials." Doc. Ent. 1 ¶ 37; Doc. Ent. 1 at 16-25 (Disbursement Authorization Forms for Expedited Legal Mail & Several Disbursement Authorization Forms). As defendant acknowledges, Doc. Ent. 15 at 8, some of the disbursement authorizations are difficult to read.

On December 10, 2007, plaintiff went to Conerly's office and asked if she would "please send out some mail for [plaintiff] because it was oversized[.]" It was a card plaintiff wanted "to send to a little girl that got shot in the City of Detroit trying to save her mother." Doc. Ent. 1 ¶ 41. When Conerly looked at the card she stated, "I'm not sending this card to that little girl. She [does not] want [a] card from some no good convict[.] Let me get your file and see what you are in here for[.]" Doc. Ent. 1 ¶ 42. Conerly looked at plaintiff's file and stated, "Oh you are here for armed robbery[.] Well, she [does not] want [a] card from [a] robber. I'm not allowing you to send that little girl that card[.]" According to plaintiff, Conerly did not send the card. Doc. Ent. 1 ¶ 43. Plaintiff also asked Conerly if she would send his $25 donation "to the fund that was set up by the girl's family[.]" However, Conerly "would not send that out either." Doc. Ent. 1 ¶ 44. According to plaintiff, "Conerly stated that the warden said she [could not] send it out[.]" Doc. Ent. 1 ¶ 46.[18]

During this visit, plaintiff claims, "Conerly started talking very disrespectful[ly] to plaintiff[;] so plaintiff got up to leave because there was no need to stay in the office after she denied [his request] to send out the card and money." Doc. Ent. 1 ¶ 48. According to plaintiff, Conerly stated, "sit back down[.]" Plaintiff kept going and exited Conerly's office, at which time Conerly called plaintiff's name. Plaintiff turned around, and Conerly "got up from her desk and reached into her black bag and pulled out her PPD and looked directly at plaintiff and smiled and then pulled the pin." Doc. Ent. 1 ¶ 49. As summarized by the Sixth Circuit and taken as true for purposes of the appeal:

---

[18]Plaintiff claims that he was forced to go to another staff member to send the money and card and that ARUS Hill sent it for plaintiff. Doc. Ent. 1 ¶ 47. This contention is supported by plaintiff's Trust Account Statement, which indicates that on December 20, 2007 a $25 donation was made. *See* Doc. Ent. 1 at 27-28 (Trust Account Statement for Dec. 5, 2007 - Jan. 14, 2008); *see also* Doc. Ent. 19 at 32-33; Doc. Ent. 19-2 at 9.

Pasley alleges that on December 10, 2007, as he was leaving Conerly's office after trying to process his mail, Conerly intentionally activated her personal protection device. According to Pasley, Conerly removed the device from her bag, looked Pasley in the eye, and pulled the pin to activate the device. Pasley said he feared for his life as officers from all over the unit quickly responded to the call. [Officer Cummings] who was standing outside of Conerly's line of sight intervened because he had seen that Pasley was outside of Conerly's office at the moment of the call. Conerly then stated that she activated the device accidentally.

*Pasley*, 345 Fed.Appx. at 983-984. *See also* Doc. Ent. 1 ¶¶ 49-53.

According to plaintiff, "Conerly then wrote a ticket on plaintiff stating that [he] [would not] leave her office and the ticket was dismissed." Doc. Ent. 1 ¶ 54. According to the December 10, 2007 major misconduct report, plaintiff was placed on bond pending the hearing and he requested as witnesses Officer Cummings, Anspach and Gosicki. Doc. Ent. 26-3 at 2.

On or about December 19, 2007, plaintiff requested Officer Cummings and prisoner Timothy Plair (#502128) as witnesses; requested that reports of why Conerly pulled the PPD pin and each officer's statement be produced; and provided his own statement. Doc. Ent. 26-3 at 4-6. Plair provided a statement on or about December 27, 2007. Doc. Ent. 26-3 at 8. Gosicki had no statement. Doc. Ent. 26-3 at 7. By a memorandum dated December 28, 2007, H.I. Bragg informed the Hearings Officer that "[u]pon arrival, [Anspach] was told by ARUS Conerly that everything was okay and no further assistance was needed." Doc. Ent. 26-3 at 9.

The hearing was conducted on January 2, 2008, and the charge was dismissed. In reaching this conclusion, Hearing Officer Falkenstein noted:

I note on the misconduct report that the date of review is not recorded. In addition, the officer whom prisoner describes as being the witness with the most knowledge, Cummings, did not provide a statement. Today is the last

day for hearing. CO Cummings was listed at misconduct report review and
at hearing investigator interview as a witness. Prisoner makes the case he is
a relevant and necessary witness. Due to lack of documented review time
and missing witness, the report is dismissed.

Doc. Ent. 26-3 at 3.

### 4.      The December 13, 2007 grievance regarding these events

On December 13, 2007, plaintiff completed a Step I grievance (HVM-07-12-01316-

17z) against Conerly in which he discusses the aforementioned events. Doc. Ent. 1 at 33,

35-36. The January 7, 2008 Step I response is signed by D. Monday and R. Rider. Doc. Ent.

1 at 33, 37.

Plaintiff completed a Step II grievance appeal; A. Walls and L. Schuhmacher

responded. Doc. Ent. 1 at 34, 39. Plaintiff completed a Step III grievance appeal, and J.

Armstrong's Step III grievance response is dated June 3, 2008. Doc. Ent. 1 at 34, 41.

In his complaint, plaintiff contends that during the investigation of the grievance,

plaintiff's witnesses listed therein were not questioned; the only people interviewed were

plaintiff and Conerly; and Officers Payne, Cummings, Clark and Hassen were not questioned

about plaintiff's allegations. Doc. Ent. 1 ¶¶ 55 - 58.[19]

### E.      The Court Should Deny Defendant's Motion for Summary Judgment.

### 1.      Defendant is not entitled to summary judgment on plaintiff's First Amendment retaliation claim.

A First Amendment retaliation claim requires a showing that: (1) "the plaintiff engaged in

protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of

ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection

---

[19]Attached to plaintiff's complaint is an assertion that he "has
exhausted his administrative remedies[,]" Doc. Ent. 1 at 29-31.

between elements one and two-that is the adverse action was motivated at least in part by the plaintiff's protected conduct". *Thaddeus-X*, 175 F.3d at 394-395. However, "[i]f the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399.

"Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting-whether activity is 'protected' or an action is 'adverse' will depend on context". *Thaddeus-X* at 388.

a.      **Plaintiff's November 2007 threat to file a grievance constitutes protected conduct.**

The protected conduct issue is mainly associated with events following the November 21, 2007 administrative hearing which allowed plaintiff to keep and store his legal materials. Plaintiff, after having difficulty obtaining containers from Defendant, told Defendant that if she refused to help him obtain the necessary storage containers, he would file a grievance. *See* Doc. Ent. 1 at 3 ¶ 13.

It is defendant's position that plaintiff "did not engage in prior protected conduct." Doc. Ent. 15 at 13. In this regard, defendant notes that HVM-07-12-01316-17z was filed on December 13, 2007 regarding a December 3, 2007 incident. Doc. Ent. 1 at 33. It is defendant's interpretation that the grievance mostly "concerns Conerly's alleged failure to process [plaintiff's] disbursement request in a timely fashion, and then allegedly backdating it." In other words, defendant contends, "[p]laintiff did not file any grievance against Conerly until after all the events occurred." Doc. Ent. 15 at 13.

In response (Doc. Ent. 19 at 14, 19), plaintiff basically restates the following portion of the Sixth Circuit's September 29, 2009 opinion:

Pasley's statement that he would file a grievance against Conerly if she did not help

17

him to obtain footlockers might constitute protected conduct under the First Amendment. It is well established that prisoners have a constitutional right to file grievances against correctional employees. *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). This circuit appears not to have determined conclusively whether merely threatening to file a grievance constitutes protected activity. In an unpublished order issued shortly after the court decided *Thaddeus-X v. Blatter*, we held that a prisoner who merely threatened to file a federal lawsuit was engaged in protected behavior. *See Dean v. Conley*, No. 98-5906, 1999 WL 1045166, at *2 (6th Cir. Nov. 9, 1999). We based this conclusion on the fact that prisoners have a constitutional right to file civil rights claims. In two other unpublished orders, we held that certain prisoners who had threatened to file grievances were not engaged in protected conduct, but in each case we based our conclusion on the fact that the threatened grievance was frivolous and that prisoners do not have a protected right to file frivolous grievances. *See Scott v. Kilchermann*, No. 99-1711, 2000 WL 1434456, at *2 (6th Cir. Sept. 18, 2000); *Thaddeus-X v. Love*, No. 98-2211, 2000 WL 712354, at *3 (6th Cir. May 22, 2000). These two orders are consistent with the possibility that, had the prisoners threatened to file legitimate grievances, the conduct would have been protected. Because Pasley's threatened grievance was arguably legitimate, his conduct was arguably protected by the First Amendment.

*Pasley*, 345 Fed.Appx. at 984-985.

Furthermore, I note that shortly before the Sixth Circuit rendered its opinion, this Court in *Carter v. Dolce*, 647 F.Supp.2d 826 (E.D. Mich. Aug. 19, 2009) (Lawson, J.), stated, "when it comes to protecting First Amendment rights, including the right to petition the government for redress, there is little difference between retaliating against a person for filing a grievance, and retaliating for threatening to file one." *Carter*, 647 F.Supp.2d at 834. The court referred to the Sixth Circuit's treatment of these cases, in particular to *Jackson v. City of Columbus*, 194 F.3d 737, 756-57 (6th Cir. 1999),[20] and concluded that the Sixth Circuit "treats filing and threatening to file as categorically

[20]In *Carter*, 647 F.Supp.2d at 834, Judge Lawson relied upon the portion of *Jackson* that stated, "[i]f, on the other hand, [plaintiff's] threat of litigation served to expose matters of public concern, such as the alleged discriminatory practices of the City, such speech would constitute public speech and merit constitutional protection." *Jackson*, 194 F.3d at 756-757.
    Another portion of *Jackson* has been overruled. In *Jackson*, the Sixth Circuit stated that "[t]o survive the City's motion to dismiss, Jackson's complaint must include factual allegations that provide direct evidence of a discriminatory motive or that

18

identical outside the prison context." *Carter*, 647 F.Supp.2d at 834.

Therefore, guided by the *Carter* decision of this Court and the aforementioned portion of the Sixth Circuit's September 29, 2009 order in this case, the Court should conclude that plaintiff's late November 2007 threat to file a grievance constitutes protected conduct and satisfies the first prong of the three-prong test.

**b.      Plaintiff has described adverse actions which followed the alleged protected conduct.**

Defendant argues that plaintiff "did not suffer any adverse action at the hands of Defendant Conerly."  Doc. Ent. 15 at 13-15.  Not every action is an adverse action; *de minimus* slights and inconveniences do not qualify.  Furthermore, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is adverse."  *Thaddeus-X*, 175 F.3d at 398.  What has been held to be adverse action is the charging of an inmate with a misconduct violation.  The court in *Thaddeus-X*, in order to determine whether actions of lesser severity merit being deemed "adverse" for purposes of a retaliation claim, adopted the standard suggested by Judge Posner in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982), that an adverse action is one that would "deter a person of ordinary firmness" from the exercise of the right at stake.

Defendant claims that the fact that a grievance was filed on December 13, 2007 demonstrates that plaintiff was not deterred by Defendant's prior alleged adverse action, including Conerly's

---

support each element of a *prima facie* case under the criteria set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792[] (1973)."  *Id.* at 751.  Later, in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002), the Supreme Court held that "an employment discrimination complaint . . . must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Swierkiewicz*, 534 U.S. at 508 (citing Fed. R. Civ. P. 8(a)(2)).

alleged but denied November 2007 threat "to send [Pasley] 'up north' after their verbal dispute over the storage bins[,]" noting that Pasley "stayed in Defendant's housing unit the entire time [Conerly] was the ARUS there." Plaintiff was moved from HVM on or about June 20, 2008. Doc. Ent. 15 at 13. In response to this argument, plaintiff relies upon *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004). Doc. Ent. 19 at 20.[21]

Here, the standard is not whether or not the action in fact deterred the plaintiff from engaging in that conduct. Rather, the standard is whether a "person of ordinary firmness" would be deterred. "The relevant question is whether the Defendant's actions are *capable* of deterring a person of ordinary firmness." *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (quoting *Thaddeus-X*, 175 F.3d at 398 (emphasis added)).

The following analysis of the alleged adverse actions is guided by the following portion of the Sixth Circuit's September 29, 2009 order:

> Conerly's actions, as alleged by Pasley, could constitute "adverse action" under the precedent of this court. Pasley alleges that after he mentioned the possibility of filing a grievance, Conerly made two immediate threats: first, to have him moved out of the unit so that he would lose his job and, second, to use her influence with a

[21]In *Gill*, the Second Circuit stated that "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381. The Court further noted that "while subjective chilling is a general requirement, where a plaintiff alleges that the protected conduct at issue is the prior filing of a grievance or lawsuit against the defendant, it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation. If bringing the action demonstrates that the plaintiff has not been chilled-and has failed to meet the subjective test-then such a plaintiff could never seek redress for retaliation." *Id*. at 383. Also, the Court stated, "the fact that a particular plaintiff such as Gill-who, we recognize, is no stranger either to the grievance system or to the federal courts-responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action." *Id*. at 384.

warden to have him moved to a location where his family would not be able to visit him. These threats could be "capable of deterring a person of ordinary firmness" from exercising protected rights, the standard for adverse action set forth in *Thaddeus-X.* 175 F.3d at 398. We held in *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir.2005), that a retaliatory transfer to another institution was an adverse action if it resulted in foreseeable, negative consequences to the prisoner, such as loss of his high-paying job and reduced ability to meet with his lawyer. This court has also noted that a mere threat is actionable if it otherwise meets the standard that it would deter a person of ordinary firmness from engaging in a protected activity. *See Smith v. Yarrow*, 78 Fed.Appx. 529, 543 (6th Cir.2003).

Additionally, Pasley alleges that Conerly's actions subjected him to the possibility of receiving a major misconduct ticket. Pasley alleges that Conerly pressured him to accept an illegal container and then reported him for possessing contraband. In an appeal from the denial of qualified immunity in a prison retaliation case, we noted that precedent "clearly establishes that the mere potential threat of disciplinary sanctions is sufficiently adverse action to support a claim of retaliation." *Scott v. Churchill*, 377 F.3d 565, 571-72 (6th Cir.2004). In that case, a prison guard retaliated against a prisoner by unsuccessfully framing him for a major misconduct charge. *Id.* Pasley also alleges that Conerly placed him in physical danger by intentionally activating her personal protection device while he was attempting to leave her office. A person of ordinary firmness could arguably be dissuaded from filing a grievance by an action which, if it occurred as Pasley alleges, would have impressed upon Pasley the amount of physical force Conerly could bring to bear on him through a false allegation. This court has noted that, "while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions." *Thaddeus-X*, 175 F.3d at 398.

*Pasley*, 345 Fed.Appx. at 985.

i.    **As described by plaintiff, Conerly provided the potentially contraband storage bin before plaintiff engaged in the protected conduct of threatening to file a grievance.**

As a result of the November 21, 2007 hearing, Hearing Officer C. Falkenstein found that plaintiff had "necessary legal material which [he] [was] allowed to keep." Doc. Ent. 1 at 10. In his unsigned complaint, plaintiff alleges that Conerly "was ordered to provide Plaintiff with the necessary legal bins for the storage of the excessive legal material[.]" Doc. Ent. 1 at 2 ¶ 5. According to plaintiff, Conerly gave him a U.S. Postal Service container. Doc. Ent. 1 at 2 ¶¶ 10-11. Plaintiff informed Conerly that the box was insufficient. Doc. Ent. 1 at 2 ¶ 12. According to

plaintiff's complaint, it was after this that he stated he would be "forced to write a grievance if [Conerly] [didn't] comply with the order to provide sufficient storage for [his] legal material[.]" Doc. Ent. 1 ¶ 13.

Plaintiff claims the container "possessed ste[e]l rods and the possession of this container would result in a major misconduct ticket for dangerous contraband." Doc. Ent. 1 at 3 ¶ 17. Plaintiff claims that Officer Hassen found the container and told plaintiff he would receive a major misconduct ticket. Then, plaintiff explained that he received the container from Conerly. Doc. Ent. 1 at 3 ¶ 18. According to plaintiff, the U.S. Postal Service container was insufficient to hold plaintiff's legal material, so, he alleges, "it is perfectly clear that Conerly was setting Plaintiff up with this dangerous contraband." Doc. Ent. 1 at 3-4 ¶ 21.

In her motion, Conerly contends that the November 21, 2007 administrative hearing report shows no such order as plaintiff alleges in Paragraph 5 of his complaint. Doc. Ent. 15 at 7. Defendant claims that she "did advise [Plaintiff] that he could order a footlocker for storage of his legal documents subsequent to a hearing he had regarding possession of legal materials." In the interim, she attests, she "consulted with [her] supervisor to decide on how those materials could be stored pending receipt of a footlocker." Defendant claims that, based on that consultation, she did authorize plaintiff "to use a U.S. mail bin temporarily for storage of his legal materials until he could secure an appropriate footlocker through the disbursement process." According to Conerly, an RUO "later confiscated that storage bin as it had a metal rod in it, but [Conerly] never ordered that confiscation[.]" Defendant further states that she does not recall Pasley's cell ever flooding. Doc. Ent. 15-3 ¶ 3.

Attached to plaintiff's response to the motion for summary judgment is his February 4, 2010 affidavit (Doc. Ent. 19 at 24-26) in which he swears to circumstances and events which are

contradictory to Conerly's January 4, 2010 affidavit (Doc. Ent. 15-3 at 1-5). Plaintiff attests that Conerly "never advised [plaintiff] that [he] could order footlockers, nor did she provide [plaintiff] with the necessary storage until nine months after the hearing was held." Doc. Ent. 19 at 24 ¶ 3. Plaintiff attests that Conerly gave plaintiff the U.S. Postal Service bin knowing that it had steel rods, "because Officer Hassen told [plaintiff] that [Defendant] sent him to [plaintiff's] room to retrieve the container." Doc. Ent. 19 at 24 ¶ 5. Plaintiff further attests that "over 70% of [his] legal material was destroyed because [Conerly] did not provide [plaintiff] with the storage in a timely ma[nn]er," and "Officer Czata provided [plaintiff] with the necessary cleaning material to get up the water after the flood." Doc. Ent. 19 at 24 ¶ 4. Plaintiff also attests that "after Conerly denied giving [plaintiff] the container[,] Officer Czata brought it to her attention that she indeed gave [plaintiff] the container and [Conerly] miraculously remembered that she gave [plaintiff] the container." Doc. Ent. 19 at 25 ¶ 6.

In reply, defendant takes issue with plaintiff's reliance upon *Scott v. Churchill*, 377 F.3d 565 (6th Cir.2004). Doc. Ent. 21 at 5-7.[22] Defendant states that "[p]laintiff did not get a ticket over the postal bin matter or the PPD incident. He was not placed in administrative segregation, and he was not subjected to a risk of prolonged incarceration resulting from the loss of good-time or disciplinary credits. To allow a retaliation claim to proceed on the flimsy assertion that he *could have* received a ticket, would allow virtually any and all bare allegations of retaliation to go to trial." Moreover, defendant adds, *Scott* "is clearly distinguishable from the instant case, because in *Scott* the prisoner actually received a misconduct and actually was placed in administrative segregation, and then the

---

[22]Actually, plaintiff's mention of *Scott* in the "adverse action" section of his response (Doc. Ent. 19 at 15) is basically a quotation of the Sixth Circuit's September 29, 2009 decision in the case at bar. *See Pasley*, 345 Fed.Appx. at 985 (quoting and citing *Scott*, 377 F.3d at 571-572).

ticket was not upheld at a hearing." Doc. Ent. 21 at 7.

In his sur-reply, plaintiff claims that Conerly "set him up to get a ticket for dangerous contraband because later [plaintiff] found out that Conerly sent [Officer Hassen] to [plaintiff's] cell to search for the postal container[.]" Doc. Ent. 25 at 4. Also, plaintiff contends, "the bin that [Conerly] gave plaintiff could only hold four books and [Conerly] knew that plaintiff possessed over four footlockers worth of legal material[.]" Doc. Ent. 25 at 4-5. Clearly, plaintiff claims, "this was a set up[.]" Doc. Ent. 25 at 5. Plaintiff seeks to get an affidavit from Czata, perhaps to "confirm that [defendant] gave plaintiff the container[,]" and/or perhaps to buttress plaintiff's statement that Czata provided cleaning material after the flood. Doc. Ent. 25 at 8; Doc. Ent. 1 ¶ 20; Doc. Ent. 19 at 24 ¶ 4. Plaintiff also contends that "[a]n affidavit from Officer Hassen will prove that defendant sent him to plaintiff's cell/room to retrieve the US Postal bin with the steel rods[.]" Doc. Ent. 25 at 8.

However, in this case the Court need not determine whether Conerly's act of giving plaintiff a U.S. Postal Service container was an adverse action. Even if, as plaintiff alleges, defendant was trying to "set up" plaintiff,[23] and even this act would have prevented a reasonable person from engaging in the protected conduct of threatening to file a grievance - on the basis that it would subject the person to a misconduct ticket for possession of contraband - the transfer of the bin occurred *prior* to plaintiff's protected conduct of threatening to file a grievance. Therefore, it cannot be said here that Conerly gave him the bin in retaliation for plaintiff threatening to file a grievance.

---

[23]In his complaint, plaintiff alleges that Conerly "[d]eliberately tried to set plaintiff up with a dangerous contraband ticket to further harass and intimidate plaintiff[.]" Doc. Ent. 1 ¶ 60D. However, it warrants repeating that, consistent with the Sixth Circuit's opinion, this report does not address any Fourteenth Amendment substantive due process claim; rather, it concerns only plaintiff's First Amendment retaliation claim.

This is so, because plaintiff made his threat *after* Conerly gave plaintiff the container. *See* Doc. Ent. 1 ¶¶ 11-13.

## ii. Conerly's alleged threat to transfer plaintiff "up north" and her alleged threat that she would no longer provide plaintiff with certain services constitute adverse actions.

In his unsigned complaint, plaintiff alleges that Conerly "called plaintiff a 'rat'"[24] and threatened to transfer him "'so far up north [hi]s family [would not] recognize [him[]] when [he] [got] back.'" Doc. Ent. 1 ¶¶ 9, 14.

In her affidavit, defendant states that "at no time did [she] ever call Pasley a 'rat,' nor did [she] ever refer to his legal mail as 'bull shit' as he claims." Doc. Ent. 15-3 ¶ 10. She attests that she never told plaintiff she "had been married to a Warden and could have him transferred so far up north that his family wouldn't recognize him when he returned." According to Conerly, "Pasley was somehow made aware that [she] had previously been married to a Warden and stated to [Conerly] that he was starting to see why that Warden had 'divorced your ass.'" Also, she claims, she "never threatened to move Pasley out of the unit if he filed a grievance on [her]." She also states that Pasley filed a grievance on December 13, 2007 and remained in her housing unit until she took a position as an ARUS at Huron Valley Complex-Women's Facility (WHV) in June 2008. Doc. Ent. 15-3 ¶ 11.

In his response, plaintiff claims that "[a]fter Plaintiff mentioned filing a grievance, Conerly made two immediate threats[.] First, to have Plaintiff moved out of the unit so that he would lose his job[.] . . . Second, to use her influence with a Warden to have him moved to a location where his family would not be able to visit him[.]" Doc. Ent. 19 at 14. Also, plaintiff claims, Conerly made

_____

[24]This conduct allegedly occurred before plaintiff made his threat to file a grievance. Doc. Ent. 1 ¶¶ 9, 13. Therefore, this report does not assess whether name-calling is an adverse action.

a third threat "the day after the search incident that she would no longer provide him with services such as processing his mail and disbursing funds from his account." Doc. Ent. 19 at 14-15. In his affidavit, plaintiff attests that Conerly "called [him] a 'rat' [and] she [threatened] to send [him] so far up north that [his] family [would not] recognize [him] when [he] [got] back." Doc. Ent. 19 at 26 ¶ 14.

In reply, referring to Whalen's affidavit, defendant notes: "It is true that the Women's facility did not open for female prisoners until May 2009,[25] but the men had to be moved out gradually – alternate placements had to be found for everyone, and they were moved in small groups because [at] HVM many of the men had mental health issues. In addition, the facility had to be renovated to accommodate women." Doc. Ent. 21 at 4-5. Also, defendant provides the February 24, 2010 affidavit of Karen Whalen, an administrative assistant at WHV/HVM. Doc. Ent. 23-2 at 1-3. Specifically, she attests that "Prisoner Pasley #166717 was transferred on June 20, 2008. He was moved for placement at his true security level II, rather than the level IV placement at HVM that he was in." Doc. Ent. 23-2 ¶ 6.[26] Plaintiff's alleged June 20, 2008 transfer from HVM in Ypsilanti, Michigan to MRF in New Haven, Michigan is confirmed by his MDOC transit list. Doc. Ent. 15-5.

The Sixth Circuit has "repeatedly held that transfer from one prison to another prison 'cannot rise to the level of an 'adverse action' because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights.'" *Smith v. Yarrow*, 78 Fed.Appx. 529, 543 (6th Cir. 2003) (citing cases). However, the Sixth Circuit has since acknowledged that a transfer "would

---

[25]WHV opened in 2009. *See* Doc. Ent. 19-2 at 13 (MDOC Website Page).
[26]Here, Whalen makes reference to the "attached Transfer Order[.]" However, it is not attached. Doc. Ent. 23-2.

deter a person of ordinary firmness from engaging in protected conduct [where] the Defendant was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's ability to access the courts. As a result of the transfer, the Plaintiff not only lost his high paying job that he needed in order to pay his attorney, but the transfer also made it more difficult for his attorney to visit with or represent him because he was moved further away from her." *Siggers-El v. Barlow*, 412 F.3d 693, 701-702 (6th Cir.2005). Later, the Sixth Circuit explained that "absent aggravating circumstances of the type present in *Siggers-El*, Hix's allegations pertaining to his transfers failed to allege adverse action that would deter a person of ordinary firmness from engaging in constitutionally protected conduct. Because Hix failed to make out a prima facie case of First Amendment retaliation, we conclude that the District Court properly dismissed his allegations for failure to state a claim." *Hix v. Tennessee Dept. of Corrections*, 196 Fed.Appx. 350, 358 (6th Cir. 2006).

Guided by *Smith*, *Siggers-El* and *Hix*, the Court should conclude that plaintiff has alleged aggravating circumstances of the kind found sufficient in *Siggers-El*. The threat to be transferred up north may have been taken seriously given Plaintiff's knowledge that Defendant had been married to a prison warden and was perhaps capable of carrying out Conerly's wishes; the transfer would result in the loss of his prison job; the transfer could result in plaintiff being farther away from his family; and, allegedly, Conerly would not process his mail or disburse funds from his prisoner account, a matter which may have been taken seriously given that plaintiff had recently filed *Pasley v. Oliver*, Case No. 01:07-cv-00583-JTN-TPG (W.D. Mich.).

Therefore, considering facts in the light most favorable to Plaintiff, the Court should conclude that plaintiff's allegations regarding Conerly's alleged threats might constitute an adverse action.

iii.    **In this case, plaintiff's allegations that Conerly backdated a disbursement request and wrote "NSF" on it are not adverse actions.    However, delay in processing a disbursement request may be an adverse action.**

In his complaint, plaintiff alleges that he received his November 29, 2007 disbursement authorization back, but "Conerly had back dated the disbursem[e]nt to reflect that she processed the disbursement on [November 30, 2007][.] She then returned the disbursement back to Plaintiff with a notation indicating that plaintiff had NSF [non-sufficient funds] to process the disbursement which was false because plaintiff had more than enough funds to process the disbursement." Doc. Ent. 1 at 5 ¶ 34. Plaintiff claims this was fraudulent, because he and Officer Payne "know for a fact that the disbursement set in the box until [December 3, 2007][.]" Doc. Ent. 1 at 5 ¶ 35. Plaintiff further claims that on Monday, December 3, 2007, Officer Clerk "took [the disbursement] into her office[.] Therefore, it's impossible for her to have processed it on [November 30, 2007]." Doc. Ent. 1 at 5 ¶ 36. *See also* Doc. Ent. 1 at 14 [Disbursement Authorization].

According to defendant, "[p]laintiff assumes that [d]efendant backdated the disbursement form[,]" and the "evidence shows that the disbursement request was processed in a timely fashion, and refutes Plaintiff's claim that Defendant Conerly delayed the processing, backdated the form, and wrote 'NSF' on the disbursement request." Doc. Ent. 15 at 13-14. Defendant attests that she processes "mail including prisoner disbursements daily and consistently and recall[s] that Pasley did not want to place his requests in [her] housing unit mailbox." According to Conerly, "Pasley seemed to act as if he could bring his request to my office whenever he wanted to, regardless of my unit practice." Conerly "advised him that he would need to follow the same rules as the other prisoners in the housing unit." Doc. Ent. 15-3 ¶ 4. As defendant attests, "the disbursement indicates that [she] processed it on Friday, 11/30/2007[,]" and "[she] never backdate[s] disbursements." Doc. Ent. 15-3 ¶ 5. Defendant also attests that she does not "indicate NSF for non-sufficient funds on

28

disbursement requests. This notation, when documented, is entered by staff in the Business Office upon their processing of received disbursements." Doc. Ent. 15-3 ¶ 6. According to defendant, plaintiff "received the document back the next business day, Monday, December 3, 2007." Doc. Ent. 15 at 14.

In response, plaintiff claims "[t]here were numerous incidents where plaintiff's First Amendment right to send mail out was 'curtailed' wherein plaintiff had to circumvent existing procedure to avoid coming into contact with defendant Conerly which, although admittedly [did not] occur but could have subjected plaintiff to institutional sanctions, . . . such as out of place misconducts as a result of plaintiff trying to have his mail and legal mail[] processed without interfer[e]nce." Doc. Ent. 19 at 9-10. Plaintiff claims "[t]here were times that [his] mail was given to [Conerly] and it never reached its destination, and times when his legal mail was late getting to its destination[.]" Plaintiff explains that he "chose to isolate and illustrate this particular incident in his complaint because this particular incident was used to bring to the light defendant Conerly's acts of retaliation." Doc. Ent. 19 at 10.

Plaintiff attests that on Thursday, November 29, 2007, he and Officer Payne "decided to set Conerly up so [Officer Payne] could see for himself that [Conerly] was retaliating against [plaintiff] by not processing [his] mail." Doc. Ent. 19 at 25 ¶ 7. On that day, plaintiff attests, he "gave the phone request to Officer Payne and he put it in Conerly's mail box[.]" The next day, on Friday, November 30, 2007, "Officer Payne and [plaintiff] noticed the phone request still on Conerly's mail box unsigned and it had not been processed." Doc. Ent. 19 at 25 ¶ 8. On Monday, December 3, 2007, plaintiff attests, he "asked Officer Clark to check Conerly's mail box and see if the phone request was still there[.]" Allegedly, it was, "so [plaintiff] asked [Officer Clark] to take [it] into [Conerly's] office for [plaintiff] so [Conerly] [could] process it[.]" According to Plaintiff, "Conerly

called [plaintiff] into her office and told [him] that she was not going to process anything for [him]." Doc. Ent. 19 at 25 ¶ 9. Plaintiff further attests that when he received the phone request back, it was backdated and had a notation indicating NSF (non-sufficient funds). Plaintiff attests, "it is clear [Conerly did this][,] because [plaintiff] had available funds in [his] account $53[.]28 so there would be no reason for the business office to write 'NSF' on the disbursement." Doc. Ent. 19 at 25 ¶ 10.

Also, apparently referring to Paragraph H of MDOC PD 05.03.130 and claiming that the Business Office is not open during the weekend, plaintiff responds, "[i]f defendant perhaps did sign the disbursement on the 30th of November there still would be no[] way for plaintiff to receive the disbursement back on Monday[,] December 3rd[.]" Additionally, plaintiff responds, "[t]here would also be no reason for the Business Office to write 'NSF' on the disbursement being that plaintiff had sufficient funds to process the request." Doc. Ent. 19 at 11.

In reply, defendant notes that plaintiff "has not offered any affidavit evidence from Payne" to support the claim that the form was still in Conerly's mailbox on Friday, November 30, 2007, and defendant contends that "it all depends on when Payne looked in the mailbox, if indeed he did." Defendant points out that the form "could have been in there, and then taken out later and processed by Conerly." Doc. Ent. 21 at 3.

Also, defendant supplies the March 1, 2010 affidavit of Jose Philip, Finance Manager of WHV, pertaining to the disbursement issue. Doc. Ent. 23 at 1-4. Philip claims that "the notation 'NSF $28.98' is something an Accounting Assistant in the Business Office would have written[,]" and "[i]t cannot be determined who wrote 'NSF $28.98.'" Doc. Ent. 23 ¶ 5(1). According to Philip, "Pasley's account shows a phone card disbursement for $50 processed on [Thursday, November 29,

2007]."[27]  Doc. Ent. 23 ¶ 5(2).  Philip notes that "[a]lthough the disbursement request from Pasley

is dated 11/29/07, it may not have reached the Business Office until 12/7/07 to 12/10/07."  Doc. Ent.

23 at 3 ¶ 4.  Furthermore, he attests:

> On Thursday, November 29, 2007, "Pasley's account balance was $649.58."
> On Monday, December 3, 2007, "Pasley's account balance was $398.14."
> On Wednesday, December 5, 2007, "Pasley's account balance was $84.58."
> From Friday, December 7, 2007 to Monday, December 10, 2007, "Pasley's account balance was $28.98; this was insufficient to process the disbursement request for $30 and thus the disbursement request was noted 'NSF 28.98' and returned to him."

*See* Doc. Ent. 23 ¶ 5(3)(4)(5)(6).  Jose Philip further states that "[t]he Account Statement submitted

to the court [Doc. 19. at 32], for the period of [December 1, 2007] to [January 22, 2008] shows

another phone card disbursement for $30 was processed on [December 7, 2007].[28]  The amount

of $30 was a debit (taken) from account 2101 Offender Funds, and $30 was a credit (paid to)

account 2596 Phone Credit Payable.  A $30 phone card debit and credit is shown on [December 11,

2007], and on [December 17, 2007];[29] a $50 phone card debit and credit is shown on [December

14, 2007]."[30]  Doc. Ent. 23 ¶ 6.  According to Philip, "[i]t would not be possible for prisoner Pasley

to receive a disbursement with the notation 'NSF $28.98' until at least Friday, [December 7, 2007],

which is when his account balance was $28.98."  Doc. Ent. 23 ¶ 7.  Philip attests that "[t]here would

be no reason to write 'NSF $28.98' on the disbursement request if it had reached the Business Office

---

[27]Pasley submitted the phone request at issue the day a $50 disbursement was processed.

[28]On December 6, 2007, Hill authorized plaintiff's disbursement request to debit his phone system $30.  It was entered on December 7, 2007.  Doc. Ent. 1 at 23.

[29]On December 17, 2007, plaintiff completed a disbursement authorization to debit his phone system $30.  It was authorized that day.  Doc. Ent. 1 at 20.

[30]On December 11, 2007, plaintiff completed a disbursement request to debit his phone system $50.  It was authorized by Hill that day and was entered on December 14, 2007.  Doc. Ent. 1 at 21.

between [December 3, 2007] and [December 5, 2007], because the account had sufficient funds at that time to process the request." Doc. Ent. 23 ¶ 8. In other words, Philip attests, "[t]here would be no reason to refuse to process the requested disbursement if the account did have sufficient funds when the request was received in the Business Office. As is shown by the Account Statement submitted to the Court, other phone card disbursements were processed when funds were available." Doc. Ent. 23 ¶ 9.

The Court has been able to discern the following time line of plaintiff's trust account:

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 11/29/2007 | | | 649.58 |
| **11/29/2007** | **Phone Credit-50** | | **599.58** |
| 11/30/2007 | Filing Fee-150 | | 449.58 |
| 11/30/2007 | Legal Postage-1.99 | | 447.59 |
| 12/3/2007 | Commissary-49.45 | | 398.14 |
| | Missing information (12/3 - 12/5 data unclear) | -39.31 | 358.83 |
| | Watch (date of purchase unclear) | -61 | 297.83 |
| 12/5/2007 | Clothing-70.75 | | 227.08 |
| 12/5/2007 | TV-142.5 | | 84.58 |
| 12/7/2007 | Commissary-25.6 | | 58.98 |
| **12/7/2007** | **Phone Credit-30** | | **28.98** |
| 12/11/2007 | Mail Room Receipt200 | | 228.98 |
| **12/11/2007** | **Phone Credit-30** | | **198.98** |

Doc. Ent. 1 at 15, 27-28 (Trust Account Statements), Doc. Ent. 23 at 3 ¶ 5 (Affidavit of Jose Philip).

In his sur-reply, plaintiff contends that "[a]n affidavit from Officer Payne can prove that defendant could not have signed and dated the phone request disbursement on the day that she claimed," which would directly challenge Philip's affidavit. Plaintiff further contends that "[a]n affidavit from Officer Clark will prove that he gave defendant Conerly the disbursement in question on Monday [December 3, 2007] making it impossible for her to . . . have signed and date[d] the disbursement in question on [Friday, November 30, 2007]," which would dispute

Philip's affidavit. Doc. Ent. 25 at 8.

It seems that there are two issues regarding plaintiff's "Disbursement Authorization (Prisoner)," Form CAR-893, dated November 29, 2007. First, on what date did defendant Conerly **approve and forward** plaintiff's request to debit his phone system $30?[31] Second, on what date did accounting **receive and process** the approved request?

The Court should conclude that the events concerning plaintiff's November 29, 2007 request that his phone system be debited $30 may be considered an adverse action. To be sure, even if defendant Conerly backdated the request - in other words dated it as signed on Friday, November 30, 2007 when it was actually signed on Monday, December 3, 2007 - it is not clear why this alone would deter a person of ordinary firmness from engaging in a protected activity. Even assuming Conerly was unscrupulous in assigning a date to her approval of plaintiff's disbursement request, Conerly's alleged inaccuracy would also need an alleged adverse effect to be considered an adverse action, such as an allegation that the delay in processing or forwarding the approved disbursement request resulted in the initial "NSF" notation.

Also, it is clear that, regardless of the date on which defendant Conerly approved and forwarded the disbursement authorization request dated November 29, 2007, it was initially received in the accounting office during the time from Friday, December 7, 2007 through Monday, December 10, 2007. This is so, because those are the dates on which plaintiff's trust fund account balance was $28.98, and the form is marked, "NSF bal[ance] 28.98[.]" Doc. Ent. 1

---

[31]Under MDOC PD 04.02.105 ("Prisoner Funds"), effective 12/01/2004, funds may be removed from a prisoner's institutional account upon his or her written request. *Id.* ¶ Q2; *see also* "Removal of Funds from Prisoner Institutional Accounts," ¶¶ Q-T. Additionally, with respect to "Prisoner Spending," ¶¶ U-Y, the policy directive sets forth the purposes for which prisoner funds may be spent. *Id.* ¶ V.

at 14.  If there were sufficient funds in the account, then such a notation could not have been

justified.  Furthermore, Philip attests that, while it cannot be determined who wrote "NSF

$28.98" on the form, this is a notation that the Accounting Assistant in the Business Office

would have made (Doc. Ent. 23 ¶ 1); therefore, a conclusion that defendant Conerly made such a

notation is not reasonably plausible.[32]

However, to the extent plaintiff's complaint alleges that Conerly impeded plaintiff's

ability to process his disbursement requests and mail, Doc. Ent. 1 ¶ 24, and to the extent such

impediments interfere with plaintiff's right to send and receive mail, a delay in processing a

disbursement request could constitute an adverse action.

### iv.     Conerly's denial of plaintiff's December 10, 2007 requests to send oversized mail and a donation are adverse actions.

Plaintiff claims that when he visited Conerly's office on December 10, 2007, he

requested to send oversized mail (a card to a little girl) and a donation (to the little girl) but, he

alleges, Conerly denied both requests.   Doc. Ent. 1 ¶¶ 41 - 44.  Plaintiff claims that no MDOC

policy would have been violated by sending the card; yet, Conerly told plaintiff that the Warden

said it could not be sent out.  Doc. Ent. 1 ¶¶ 45-46.  According to plaintiff, he "was forced again

to go to another ARU[S] to send the money and card out[.] ARUS Hill stated that it was no

problem and sent it out[.]"  Doc. Ent. 1 ¶ 47.  The $25 donation was apparently processed on

December 20, 2007.  Doc. Ent. 1 at 27-28; Doc. Ent. 19 at 32-33 (Trust Account Statement);

Doc. Ent. 19-2 at 9.

In response, defendant cites the version of MDOC PD 04.02.105 effective December 1,

---

[32]It is worth noting that on December 11, 2007 - after a same-day deposit of $200 into plaintiff's prisoner trust fund account - plaintiff's trust account was debited and his phone account was credited $30.  Doc. Ent. 19 at 32.

2004 (Doc. Ent. 15-4), contending that it "prohibits prisoners from sending money to non-family." Doc. Ent. 15 at 14. In her affidavit, defendant acknowledges her denial of plaintiff's disbursement request "to send money and a card to a young girl who had been shot by her mother's boyfriend who was on parole." Conerly contends that "the Prisoner Funds policy does not allow money to be sent by prisoners to individuals that are not family members[.]" Therefore, she attests, she "shared this prisoner's request with Deputy Warden Vallie who forwarded it to Warden Susan Davis for further review. Warden Davis agreed that the request was inappropriate which lead to [her] denial of that disbursement." Doc. Ent. 15-3 ¶ 7.

Therefore, Conerly contends, "the adverse action, if any, was not caused by [her]." Doc. Ent. 15 at 14. According to Conerly, "Pasley disregarded that denial and requested that another [ARUS] process his disbursement request." Doc. Ent. 15-3 ¶ 7.[33] Defendant argues that "Plaintiff has no 'right' to send money to someone he does not know. If he managed to sneak the money out anyway, he suffered no harm. The few days delay in getting the money out is at best a *de minimus* 'harm.'" Doc. Ent. 15 at 15.

Citing *Turner v. Safley*, 482 U.S. 78 (1987)[34] and MDOC PD 05.03.118 ("Prisoner

---

[33]Defendant Conerly attests that "[t]he only time [she has] denied a disbursement for legal mail is if the item does not qualify as legal mail." Doc. Ent. 15-3 ¶ 8.

[34]In *Turner*, the Supreme Court held that "a prison regulation [that] impinges on inmates' constitutional rights … is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. "The *Turner* Court reviewed four factors that are relevant in determining the reasonableness of a challenged prison regulation[:]

'First there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.' [*Turner*, 482 U.S. at 89]. If, not the regulation is unconstitutional, and the other factors do not matter. *Id*. at 89-90[]. Unlike the first factor, the remaining factors are considerations that must be balanced

Mail"),[35] plaintiff claims Conerly's denial of his requests to send the card and money violated his First Amendment right to send and receive mail. Doc. Ent. 19 at 11. Plaintiff contends that Conerly's statement that her supervisors told her plaintiff's request was inappropriate under the policy "was false and fabricated and a good demonstration as to how far Defendant would go to retaliate against Plaintiff." Doc. Ent. 19 at 11-12. In plaintiff's opinion, "[i]t is highly unlikely that the Warden would encourage Defendant to violate the law and MDOC policy." Doc. Ent. 19 at 12. Here, plaintiff specifically cites his rights under *Turner* and the portion of the mail policy which provides with respect to prisoner outgoing mail: "Each facility shall offer prisoners outgoing mail service through the U. S. Postal Service. The facility also may offer outgoing mail service for oversize or overweight mail, including packages, through a legitimate alternate carrier. Except as set forth in Paragraphs I through L, prisoners shall be required to pay the cost of postage for any mail service used." MDOC PD 05.03.118 ¶ N. Therefore, plaintiff claims, "there was no violation of policy to send out the oversized card." Also, plaintiff cites Paragraph V(5) of MDOC PD 04.02.105 ("Prisoner Funds"),[36] which permits donations to charitable organizations. It is plaintiff's position that "sending out the mail and the funds was not against

---

        together: (2) 'where there are alternative means of
        exercising the right that remain open to prison
        inmates'; (3) 'the impact that accommodation of the
        asserted constitutional right will have on guards and
        other inmates, and on the allocation of prison
        resources generally'; and (4) whether there are 'ready
        alternatives' available 'that fully accommodate the
        prisoner's rights at *de minimis* cost to valid
        penological interests.' *Id*. at 90-91[.]

*Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994).
[35]MDOC PD 05.03.118, "Prisoner Mail," effective 09/14/2009, is attached to plaintiff's response. Doc. Ent. 19 at 34-46.
[36]MDOC PD 04.02.105, "Prisoner Funds," effective December 1, 2004, is attached to plaintiff's response. Doc. Ent. 19 at 47-50, Doc. Ent. 19-2 at 1-7.

any penological interest as Defendant claims.  The mail and card [were] later mailed out by ARUS Hill because of Defendant's denial." Doc. Ent. 19 at 12.

Furthermore, plaintiff attests that he "went into Conerly's office to send out a card and to send money to a little girl[']s charitable fund raiser and Conerly would not send it out for [him][.] She state[d] that the Warden told her that it was against policy to send it out[.]  [This] is not true[.] [Conerly] did not call the Warden before she denied sending the items out." Doc. Ent. 19 at 25 ¶ 11.  Plaintiff attests that "ARUS Hill sent the card and the money out and [ARUS Hill] is the one [who] informed [plaintiff] that the Warden did not tell [Conerly] she [could not] sent it out." Doc. Ent. 19 at 26 ¶ 15.  Plaintiff also attests that "ARUS Hill told [plaintiff] that he had a[n] e-mail telling him not to process anymore of [plaintiff's] mail and paperwork and that the e-mail was also sent to other ARUS's[.]" Doc. Ent. 19 at 26 ¶ 16.

In reply, defendant cites a $25 donation on plaintiff's trust account statement dated December 20, 2007 (Doc. Ent. 19 at 32-33; Doc. Ent. 19-2 at 9) and MDOC PD 04.02.105(V)(5), which provides that a prisoner's funds may be contributed to a charitable organization "as approved by the Warden or designee[,]" (Doc. Ent. 15-4).  Defendant contends that plaintiff has offered "no evidence to support that it was a donation to this little girl, or that the Warden approved the donation to the little girl[.]"  Doc. Ent. 21 at 4.

In his sur-reply, plaintiff contends that "Conerly lied to plaintiff telling him that the warden said she could not send the card and money out[.]" Doc. Ent. 25 at 5.  Plaintiff asserts that "an affidavit from RUM Hill will prove that he was the one that mailed out the $25 donation to the charitable foundation fundraiser set for the little girl and mailed the card[.]" Doc. Ent. 25 at 8.

As an initial matter, it does not appear that documentation regarding Conerly's rejection

of plaintiff's December 10, 2007 requests to send oversized mail and make a donation are part of the record.  Nor does it appear that documentation regarding RUM Hill's alleged approval of the December 20, 2007 donation is part of the record.  However, defendant Conerly has attested that she denied this disbursement request, because MDOC PD 04.02.105 ("Prisoner Funds") "does not allow money to be sent by prisoners to individuals that are not family members," and "Warden Davis agreed that the request was inappropriate[.]" Doc. Ent. 15-3 ¶ 7.[37]  On the other hand, the Court can only assume that RUM Hill's alleged approval of the request to send the donation was based upon MDOC Policy Directive 04.02.105 ("Prisoner Funds"), Paragraphs U-Y of which address prisoner spending - namely the provision that a prisoner may "[c]ontribute to charitable organizations as approved by the Warden or designee."  MDOC PD 04.02.105, effective 12/01/2004, ¶¶ V(1), V(5).

As for the request to send the card, MDOC PD 05.03.118 ("Prisoner Mail") provides:

> Prisoners shall be permitted to send and receive uncensored mail to or from any person or organization unless the mail violates this policy or Administrative Rule 791.6603.  Mail shall not be prohibited solely because its content is religious, philosophical, political, social, sexual, unpopular, or repugnant.  However, mail shall be prohibited if it is a threat to the security, good order, or discipline of the facility, may facilitate or encourage criminal activity, or may interfere with the rehabilitation of the prisoner.

Id., effective 09/14/2009, ¶ D.  Additionally, the prisoner mail policy provides that "[a] prisoner in a CFA facility shall be permitted to send air, certified and foreign mail, and mail that weighs more than two ounces, via disbursement.".  Id. ¶ O.

At this point, it is not clear whether defendant's refusal to send the oversized mail (the

---

[37]Paragraph V sets forth purposes for which prisoners may spend their funds, including the provision that a prisoner may "[t]ransfer to family members and to a parent or verified legal guardian of the prisoner's child, stepchild or grandchild."  Id. ¶ V(1).

card to the little girl) was justified. It is also not clear why the donation request which Conerly rejected was allegedly approved by RUM Hill. Even though these issues are really germane to the issue of causation, the disparity of the decisions regarding the donation calls into question whether plaintiff's donation was permitted under prison policy. Furthermore, even if Conerly's rejections of the mail and donation requests were justified by policy, her rejections may still be considered adverse actions. In other words, if it is shown that prison policy permitted his requests to send the card and donation, a reasonable jury could conclude that Conerly's rejection of plaintiff's request to send oversized mail or Conerly's rejection of plaintiff's request to send a donation would deter a person of ordinary firmness from exercising his or her right to send mail or donations from the prison.[38]

### v.   There is a material dispute regarding why Conerly activated her PPD pin on December 10, 2007, and Conerly issued plaintiff a major misconduct ticket for DDO the same day.

Plaintiff claims that on the day he was in her office about sending the card to the little girl, defendant talked to plaintiff disrespectfully. Plaintiff claims he "got up to leave because there was no need to stay in the office after she denied [his request to send the card and money to the little girl][.]" Doc. Ent. 1 ¶ 48. According to plaintiff, "Conerly got up from her desk[,]"

[38]This report assumes that plaintiff's First Amendment claim is based solely upon defendant's alleged retaliation for plaintiff's exercise of his First Amendment right "to petition the Government for a redress of grievances[,]" and not upon another clause of that same amendment. The analysis of the constitutionality of a prison regulation under *Turner* and the analysis of a free exercise and/or RLUIPA claims, *see Massingill v. Livingston*, 277 Fed.Appx. 491, 493 (5th Cir. 2008), *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008), are distinct from the First Amendment retaliation analysis under *Thaddeus-X*. At most, the Court might consider the "impact" factor in a *Turner* claim or the "substantial burden" factor in a free exercise/RLUIPA claim as analogous when analyzing the "adverse action" factor of a First Amendment retaliation claim.

reached into her black bag[,] pulled out her PPD[,] looked directly at Plaintiff[,] smiled and then pulled the pin." Doc. Ent. 1 ¶ 49. Plaintiff claims that he "feared for his life because these officers came in as though they were going to handle the situation by all means necessary[,]" but "what saved Plaintiff was that Officer Cummings was standing [outside] the entrance of [Conerly's] door and [Conerly] didn't see [Officer Cummings] and he informed the Officers that [plaintiff] was not in [Conerly's] office when [Conerly] pulled her pin." Doc. Ent. 1 ¶¶ 51, 52. Plaintiff states that "[w]hen [Conerly] came out and noticed that Cummings had been standing there all the time she then stated that the pin went off by mistake." Doc. Ent. 1 ¶ 53.

Also, plaintiff alleges that Conerly wrote plaintiff a ticket on or about December 10, 2007 "stating that Plaintiff [would not] leave her office and the ticket was dismissed." Doc. Ent. 1 ¶ 54.

In her motion, defendant argues that "[a]ccidentally pulling a PPD device was not an adverse action." In support of her claim that "[p]laintiff suffered no adversity[,]" defendant points out that plaintiff "did not attach a copy of the ticket to his complaint[,]" and "does not allege that he was put in segregation pending a hearing." Doc. Ent. 15 at 15.

The parties' affidavits contradict with respect to events that occurred after the oversize mail request. To begin, defendant attests that "after Pasley refused to leave my office, I removed my [PPD] in an effort to show the prisoner that I was serious about him leaving that area. Although I was willing to pull the pin of that PDD if necessary, I had not intended to do so. However, the pin was loose and was accidentally pulled. I informed the Shift Commander that pulling the pin was done by mistake and that it was not my intention to alert staff or have Pasley sent to segregation. No one wrote Pasley a misconduct ticket as Pasley alleges in ¶ 54." Doc. Ent. 15-3 ¶ 9.

By contrast, plaintiff attests that "when [Conerly] pulled the PPD [plaintiff] was not in [Conerly's] office and Officer Cummings was standing outside her door with eye to eye contact with [plaintiff] when [Conerly] pulled the pin."  Doc. Ent. 19 at 25 ¶ 12.  Plaintiff attests that Conerly wrote him a ticket for disobeying a direct order (DDO), which was dismissed at the hearing.  Doc. Ent. 19 at 25 ¶ 13.  When alleging that he was written a major misconduct by Conerly (Doc. Ent. 19 at 20), plaintiff refers to RUM D. Monday's January 7, 2008 Step I grievance response, wherein it states "the prisoner was given a DDO and did not have his bond revoked[,]" (Doc. Ent. 19-2 at 11).

In addition, plaintiff's response claims Conerly's activation of her PPD was not accidental.  He asserts that he "was handcuffed and locked in his room."  According to plaintiff, "had Officer Cummings not intervened[,] Conerly would have falsely had plaintiff placed in administrative segregation."  Doc. Ent. 19 at 13.

In reply, defendant argues that "[p]laintiff has not provided evidence that he got a ticket from Conerly on December [10], 2007."  Doc. Ent. 21 at 4.  In his sur-reply, plaintiff contends that his copies of "the misconduct and disposition [were] destroyed when [his] cell/room flooded[,]" and he "has made several attempts to obtain the misconduct report and disposition but has failed due to the lack of cooperation by MDOC staff[.]"  Although D. Monday's January 7, 2008 grievance response is evidence that a major misconduct ticket for DDO was written, plaintiff contends it "is not as effective as [providing a copy of] the misconduct and disposition itself[.]" Doc. Ent. 25 at 7.  Plaintiff contends that "[a]n affidavit from Officer Cummings will prove that defendant wrote plaintiff a misconduct for DDO on December 10, 2007, and that defendant pulled the PPD pin on purpose and not by accident as she claim[s][.]"  Doc. Ent. 25 at 8.

However, defendant Conerly recently provided the Court with her September 1, 2010 affidavit, in which she attests that "[a] considerable time after signing [the January 4, 2010] affidavit, a copy of the [December 10, 2007] ticket and accompanying records were located." According to Conerly, she "was shown a copy of a major misconduct ticket for [DDO] that [she] wrote against [plaintiff] on December 10, 2007. [She] truly did not remember writing this ticket when [she] signed the affidavit on January 4, 2010. However, seeing the ticket did refresh [her] memory." Doc. Ent. 26-2 ¶ 4. Conerly further attests that she "did not write this major misconduct ticket to punish or retaliate or harass prisoner Pasley. [She] gave him an order to leave and he did not comply. As indicated in [her] earlier affidavit, [her] PPD was activated accidentally." Doc. Ent. 26-2 at 3 ¶ 9. Still, in her accompanying brief, she asserts that "[t]he hearing officer did not rule on the merits of the ticket at all. Plaintiff suffered no adversity as a result of this ticket." Doc. Ent. 26 at 4.

Conerly's issuance of a major misconduct ticket for DDO[39] is an adverse action. *See*

_____

[39]Disobeying a direct order (DDO) is a major rule violation which could subject a prisoner to the issuance of a major misconduct. See MDOC PD 03.03.105 ("Prisoner Discipline"), Attachment B. Major misconducts are discussed at ¶¶ K-LL of the Prisoner Discipline policy, and misconduct sanctions are discussed at ¶¶ TT-BBB, which provides in part that "[u]pon a finding of guilt in a minor or major misconduct hearing, the hearing officer shall impose one or more of the sanctions set forth in Attachment D[,]" and "[a] hearing officer may give a prisoner credit for time spent in segregation or on toplock pending a hearing but is not required to do so." MDOC PD 03.03.105 ¶¶ TT, YY. Other actions resulting from a major misconduct, which are described at ¶¶ FFF-KKK, provide in part that "[a] prisoner may be reclassified to administrative segregation based solely on a major misconduct guilty finding as set forth in PD 04.05.120 'Segregation Standards'." MDOC PD 03.03.105 ¶ III. Sanctions for a major misconduct include detention, toplock, loss of privileges, assignment of extra duty and restitution. MDOC PD 03.03.105, Attach. D. The loss of privileges sanctions provides that "[d]irect access to general library (not law library; prisoners in segregation shall continue to have books delivered to them

*Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002) ("the issuance of the major misconduct charge subjected him to the risk of significant sanctions.") (citing Mich. Admin. Code R. 791.5505(1)).

Furthermore, defendant did not threaten to pull her PDD; she did so, and corrections officers rushed to the location. The parties dispute the reason for which Conerly activated the PPD pin. Still, taking plaintiff's claims to be true, if there had not been another individual who witnessed the incident of defendant pulling the PDD pin when plaintiff was outside her office, plaintiff may have faced serious consequences. The December 10, 2007 incident may have been capable of deterring a reasonable person from filing a grievance. As noted above, the Sixth Circuit recognized: "Pasley also alleges that Conerly placed him in physical danger by intentionally activating her personal protection device while he was attempting to leave her office. A person of ordinary firmness could arguably be dissuaded from filing a grievance by an action which, if it occurred as Pasley alleges, would have impressed upon Pasley the amount of physical force Conerly could bring to bear on him through a false allegation." *Pasley*, 345 Fed.Appx. at 985.

**c.      There is enough indirect evidence to infer a retaliatory motive by defendant.**

For a First Amendment claim, the adverse action must have been in response to the protected conduct. "The relevant showing in such cases must be more than the prisoner's 'personal belief that he is the victim of retaliation.'" *Johnson v. Rodriquez*, 110 F.3d 299, 310 (5th Cir. 1997) (quoting *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995)). However, retaliation "rarely can be supported with direct evidence of intent". *Harbin-Bey v. Rutter*, 420

---

consistent with PD 04.05.120 "Segregation Standards")."  MDOC PD
03.03.105, Attach. E.

43

F.3d 571, 580 (6th Cir. 2005) (quoting *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987)).  "But

conclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient

to state ... a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting Gutierrez v. Lynch, 826

F.2d 1534, 1538-39 (6th Cir.1987)).  That is why "[c]ircumstantial evidence, like the timing of

events or the disparate treatment of similarly situated individuals, is appropriate" to consider

when determining whether a genuine issue of fact on the third prong has been established.

*Thaddeus-X*, 175 F.3d at 399.  Furthermore, "temporal proximity alone may be significant

enough to constitute indirect evidence of a causal connection so as to create an inference of

retaliatory motive."  *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004).

> As the Sixth Circuit stated in its September 29, 2009 order:

> Finally, Pasley alleges a causal connection between his threat to file a grievance
> and Conerly's actions.  The causal connection hinges on Conerly's subjective
> motivations for her actions.  *See [Thaddeus-X]* at 399.  Conerly's alleged threats
> to have Pasley transferred came in direct response to Pasley's statement about
> filing a grievance.  She gave him the postal container during that same encounter,
> and the search of Pasley's cell-along with Conerly's initial denial that she had
> provided the contraband container-occurred shortly thereafter.  According to
> Pasley, Conerly informed him the next day that she would no longer process his
> mail or disbursement requests, and it was in the context of Pasley's trying to send
> out mail that Conerly activated her personal protection device.  Pasley has
> sufficiently alleged that Conerly's actions were motivated, at least in part, by his
> threat to file a grievance against her.  *See Thomas v. Eby*, 481 F.3d 434, 441 (6th
> Cir.2007).

*Pasley*, 345 Fed.Appx. at 985-986.

In her motion, defendant argues that "[g]iving Plaintiff a U.S. Postal bin [could not] have

been retaliatory, because Plaintiff does not allege he engaged in any protected conduct before

that occurred."  Doc. Ent. 15 at 12.  Defendant also claims, with respect to the December 10,

2007 mail denial, that "the adverse action, if any, was not caused by Defendant Conerly."  Doc.

Ent. 15 at 14.  Rather, relying upon *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997)

("[Plaintiff's] retaliation claim must rest on proof that [defendant] filed the disciplinary action against him in retaliation for [plaintiff's] exercise of his constitutional rights and that the retaliatory action advanced no legitimate penological interest."), Conerly contends that her "refusal to mail the card and money was based on MDOC policy." Doc. Ent. 15 at 14-15.[40]

In response, plaintiff contends that "Conerly's threats to have plaintiff transferred came in direct response to plaintiff's statement about filing a grievance[.] She gave him the postal container during that same encounter[,] and the search of plaintiff's cell along with Conerly's initial denial that she had provided the contraband container - occurred shortly thereafter." Also, plaintiff contends, "Conerly informed him the next day that she would no longer process his mail or disbursement request, and it was in the context of plaintiff's trying to send out mail that Conerly activated her personal protection device." Doc. Ent. 19 at 16. Also, plaintiff quotes the aforementioned portion of the Sixth Circuit's opinion. Doc. Ent. 19 at 20.

Having examined the record, I conclude that there is enough indirect evidence - in both the sequence of events - i.e., events that took place after Plaintiff expressed intent to file a grievance - and their temporal proximity to that expression of intent - to infer a retaliatory motive on the part of the Defendant.

**2.      Defendant is not entitled to qualified immunity on plaintiff's First Amendment retaliation claim.**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory

---

[40]According to Conerly, "[t]he policy that allows money to be sent only to family members advances the legitimate penological interest of ensuring that prisoners do not extort money from other prisoners' families or from members of the public for 'favors.'" Doc. Ent. 15 at 15.

or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The failure to so plead precludes a plaintiff from proceeding further, even from engaging in discovery, since the plaintiff has failed to allege acts that are outside the scope of the defendant's immunity." *Kennedy v. City of Cleveland*, 797 F.2d 297, 299 (6th Cir. 1986) (external footnote omitted) (citing *Mitchell v. Forsyth*, 105 S.Ct. 2806, 2816 (1985)).

"Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "The privilege is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Saucier*, 533 U.S. at 200-201 (quoting *Mitchell*, 472 U.S. at 526).

The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step analysis: (1) has plaintiff alleged a violation of a constitutional right?; (2) if so, was that right clearly established at the time of the alleged conduct?;[41] and (3) if the right was clearly established, has plaintiff alleged and sufficiently supported that the official actions were objectively unreasonable in light of this clearly established right? *See Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996).[42] "Once the qualified immunity defense is raised, the

[41]Defendant points out that "[t]his inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" Doc. Ent. 15 at 6 (quoting *Saucier*, 533 U.S. at 201).

[42]*See also Saucier v. Katz*, 533 U.S. 194 (2001), wherein the Supreme Court stated, "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial

burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity."

*Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir.2004)).

Defendant argues that she is entitled to qualified immunity, because "she did not violate any of Plaintiff's constitutional rights." Doc. Ent. 15 at 15-17. Specifically, defendant states:

> In this case, Plaintiff did not suffer retaliation in violation of his constitutional rights. Plaintiff did not file any grievance until after all of the complained-of acts occurred. Even if the court were to assume that he threatened to file a grievance, and the threat constitutes protected conduct, Plaintiff's retaliation claims fail because he suffered no adversity, and was not "deterred from engaging in protected conduct" – as noted, he filed a grievance afterwards. Plaintiff was able to get appropriate storage bins for his legal property when they became available. [Cplt, ¶ 22]. Defendant Conerly processed the $30 disbursement request in a timely fashion and she did not mark his disbursement request "NSF" – the Business Office did. The Warden is the person who disapproved Plaintiff sending money to a little girl in Detroit, as that would violate policy. Plaintiff was not written a ticket after the PPD incident. Because none of Defendant Conerly's actions meet the standard for a retaliation claim, she did not violate any of Plaintiff's constitutional rights, and she is entitled to qualified immunity.

Doc. Ent. 15 at 17.

Plaintiff argues that Conerly "is not entitled to qualified immunity because she violated plaintiff's constitutional rights[.]" Doc. Ent. 19 at 19-20. Plaintiff contends that he has "alleged

---

inquiry." *Saucier*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

Last year, the Supreme Court stated, "[a]lthough we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that *it is often beneficial*." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009) (emphasis added).

facts sufficient to show that his First [Amendment] rights were substantially burdened." Doc. Ent. 19 at 20.

The defense of qualified immunity should only be addressed after determining whether plaintiff has stated a constitutional claim upon which relief can be granted. "[T]he better approach is to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998), citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

Therefore, if the Court agrees with my foregoing recommendations, and in light of the Supreme Court's direction in *County of Sacramento*, the Court need only address the issue of defendant's entitlement to qualified immunity with respect to plaintiff's First Amendment retaliation claim. Furthermore, defendant's qualified immunity argument is limited to the allegation that plaintiff has not met the first test - whether plaintiff has alleged a violation of a constitutional right? In other words, defendant does not argue that the right was not clearly established and/or does not argue that her actions were objectively reasonable in light of that right.

Therefore, the Court should conclude that defendant is not entitled to qualified immunity with respect to plaintiff's First Amendment retaliation claim against Conerly. First, as indicated above, plaintiff's November 2007 threat to file a grievance constituted protected conduct (Section II.E.1.a). Second, the fact that he later filed a grievance is not dispositive of the deterrence issue; as discussed above, plaintiff has alleged some forms of adverse action, and

there is a material dispute over why Conerly activated the PPD pin (Section II.E.1.b). Finally, there is enough indirect evidence to support an inference of retaliatory motive (Section II.E.1.c).

III.    **NOTICE TO PARTIES REGARDING OBJECTIONS:**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 9/10/10

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and   by electronic means or U.S. Mail on September 10, 2010.

s/Eddrey Butts
Case Manager

50